**O**

# United States District Court
# Central District of California

LUKE CARLSON, et al.,

           Plaintiffs,

   v.

CITY OF REDONDO BEACH; et al.,

           Defendants.

Case № 2:20-cv-00259-ODW (AFMx)

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [45]**

## I.    INTRODUCTION

Plaintiffs Luke Carlson ("Carlson") and his parents—Jeanne Zimmer and Jeffery Carlson—bring this excessive force action against Defendants the City of Redondo Beach (the "City"), Officer Ryan Crespin, Officer Patrick Knox, and Sergeant Mark Valdivia, based on allegations that they used unreasonable deadly force when they shot Carlson, and excessive force when apprehending his parents. Defendants move for summary judgment, or partial summary judgment, on Plaintiffs' eight claims and claim for punitive damages. (Mot. Summ. J. ("Mot." or "Motion"), ECF No. 45.)  As discussed below, genuine disputes of material fact preclude summary judgment as to all claims and the Court **DENIES** Defendants' Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II.      BACKGROUND

The following facts are undisputed unless otherwise noted.   On January 8, 2019, at approximately 9:07 p.m., the Redondo Beach Police Department ("RBPD") received a 911 call of a family disturbance, indicating that the caller's neighbors were screaming and that a male voice was yelling he was going to kill somebody.  (Defs.' Statement Uncontroverted Facts ("DSUF") 1, 2, ECF No. 46.)  Multiple other callers reported the same disturbance.  (*Id.* at 3.)  One caller reported hearing someone say, "I'll kill you with my bare hands" and another caller reported hearing the cocking of a shotgun with a female screaming in the background.  (*Id.* at 3, 4.)

RBPD officers—including Crespin, Knox, and Valdivia—responded to the calls.[2]  (*Id.* at 5.)  Upon arrival, the officers were unsure of the exact location of where the disturbance was but attempted to establish an arrest rescue team based on the serious nature of the call.  (*Id.* at 6, 7.)  Valdivia instructed the other officers to contain the area in order to identify the exact location of the disturbance.  (*Id.* at 8.)

Defendants assert that they heard yelling coming from the residence of 1002 Esplanade Avenue (the "Residence") and according to Crespin, the loud screams sounded like somebody was in distress; however, Plaintiffs dispute that any officer heard such yelling or screams.  (Pls.' Statement Genuine Disputes ("PSGD") 10, 11, ECF No. 62-1.)  Knox then led the other officers down a narrow pathway on the side of the Residence.  (DSUF 12, 13.)  Defendants contend that as Crespin neared the back gate of the Residence, he looked over his right shoulder and saw through the last window before the gate a male—later identified as Carlson—holding a black semiautomatic handgun with his right hand to the right side of his head.  (*Id.* at 16.)  Plaintiffs assert that Carlson never had a gun in his hand or pointed at his own head, and his hands were visibly empty during the incident.  (PSGD 16.)  Crespin then yelled, "Gun, gun" to notify the other officers of Carlson's alleged gun.  (DSUF 19.)

---

[2] The Court uses "the officers" to generally refer to all officers at the scene of the incident, including Defendant-officers Crespin, Knox, and Valdivia, as well as non-party officers.

Crespin estimated that Carlson's parents were about three to four feet away from Carlson at this time.  (*Id.* at 18.)  Crespin commanded Carlson to "drop the gun."  (*Id.* at 20.)  Defendants contend that Carlson then brought "the gun at a 45-degree angle and start turning towards Officer Crespin."  (*Id.* at 21.)  Defendants assert that at this time, "Officer Crespin thought [Carlson] was going to open fire at him, and then, exit the back door, where [Carlson] would encounter Officer Knox, who was entering the backyard."  (*Id.* at 22.)  Within seconds of Crespin's command to "drop the gun," Crespin fired his gun at Carlson.  (*Id.* at 23.)  Defendants assert that "within a second after Officer Crespin fired his last shot, Officer Crespin heard another shot . . . [and] believed [Carlson] was exiting the back door."  (*Id.* at 24.)  However, the gunshot that followed "within a second" after Crespin's was fired by Knox, who was waiting at the back gate at the time.  (*Id.* at 25; DSUF 33.)

Before firing his gun, Knox heard Crespin's "drop the gun" command followed by gunshots, and also allegedly "saw flashes."  (PSGD 25, 26.)  Knox then saw Carlson start to walk out the back door and turn towards him.  (*Id.* at 27.)  Knox could not see Carlson's hands, which were angled down toward Carlson's waistband.  (*Id.* at 28.)  According to Knox, Carlson appeared to have a weapon.  (*Id.* at 29; Decl. Craig Smith ("Smith Decl.") ¶ 21, Ex. 19 ("Knox Dep.") 9:1–12, ECF Nos. 45-1, 45-3.)  Knox gave commands to Carlson, stating "Let me see your hands."  (DSUF 30.)  The parties dispute whether Carlson complied.  (PSGD 31.)

Defendants contend that Carlson walked toward Knox, who had no cover at the time; Plaintiffs dispute both of these contentions.  (*Id.* at 27, 32, 33.)  Knox fired one shot at Carlson.  (DSUF 33.)  Carlson then fell to the ground and another officer assisted Knox in immediately securing and handcuffing Carlson.  (*Id.* at 35.)  Officers observed multiple gunshot wounds on Carlson including two bullet wounds to the chest under the left pectoral and a bullet wound to his back.  (PSGD 157.)  Carlson was unarmed.  (*Id.* at 57, 88, 105, 124.)

Carlson's parents were only feet away from him and watched Knox shoot him down.  (*Id.* at 124.)  After the shooting, Valdivia walked into the backyard, where he saw Carlson on the ground and Carlson's parents yelling at the officers.  (DSUF 40.)  All of the officers entered the backyard and Valdivia "tried to get [Carlson's parents] away from" the door; he "physically grabbed them" by their forearms and pulled them, then pushed them down the walkway  towards the street before handing them off to another officer.  (PSGD 128.)  Carlson's mother said it felt like the officers "pulled her arm out of the socket."  (*Id.* at 132.)  When handling Carlson's father, the officers—including Valdivia—pulled his arms so far behind his back that both of his rotator cuffs tore and required surgery thereafter.  (*Id.* at 134.)  The parties dispute whether Valdivia grabbed Carlson's parents in a "forceful" manner and put their hands behind their backs.  (*Id.* at 43.)  After Valdivia escorted Carlson's parents to the front of the Residence, he went inside the house and saw a handgun on top of a washer or dryer near the backdoor of the Residence.  (*Id.* at 46, 47.)

Plaintiffs filed this civil suit against Defendants, asserting eight claims, the first four pursuant to 42 U.S.C. § 1983 and the remaining four under California law: (1) excessive force, (2)–(4) municipal liability, (5) battery, (6) negligent infliction of emotional distress, (7) negligence, and (8) violation of the Bane Act, California Civil Code section 52.1.  (Compl. ¶¶ 48–115, ECF No. 1.)  Defendants now seek summary judgment on all eight claims and on Plaintiffs' claim for punitive damages.

### III.        LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986), and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134

(9th Cir. 2000).  A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the Court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment.  *Addisu*, 198 F.3d at 1134.

Once the moving party satisfies its initial burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  *See Celotex*, 477 U.S. at 322–23; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).  A "non-moving party must show that there are 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"  *Cal. Architectural Bldg. Prods.*, 818 F.2d at 1468 (quoting *Anderson*, 477 U.S. at 250).  Conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment, as is "uncorroborated and self-serving" testimony."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Courts should grant summary judgment against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.

## IV.      EVIDENTIARY OBJECTIONS

The parties raise numerous objections to evidence presented in the various filings.  (*See* PSGD; Pls.' Evid. Objs., ECF No. 62-2; Defs.' Resp. PSGD, ECF No. 75-1; Defs.' Evid. Objs. PSGD, ECF No. 75-2.)  Evidentiary objections in motions for summary judgment are typically unnecessary and not useful.  This is

because, "[r]egardless of whether a party objects, the Court . . . will always recognize plain error." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (first citing Fed. R. Evid. 103(d); and then citing *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 357 (9th Cir. 1996)).  "Nevertheless, attorneys routinely raise every objection imaginable without regard to whether the objections are necessary, or even useful, given the nature of summary judgment motions in general, and the facts of their cases in particular." *Id.* Evidentiary objections based "on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself." *Id.* "Instead of *objecting*, parties should simply *argue* that the facts are not material." *Id.*

Thus, the Court **OVERRULES** all boilerplate objections and improper argument in the parties' objections. (*See* Scheduling & Case Mgmt. Order 7–9, ECF No. 17.)  When the objected evidence is unnecessary to the resolution of the summary judgment motion or supports facts not in dispute, the Court need not resolve those objections.  To the extent the Court relies on objected evidence without discussion in this Order, the Court **OVERRULES** the objections. *See Burch*, 433 F. Supp. 2d at 1122 (proceeding with only necessary rulings on evidentiary objections).

## V. DISCUSSION

Defendants move for summary judgment on all eight of Plaintiffs' claims and their claim for punitive damages.  (Mot. 1.)  Plaintiffs assert that genuine disputes of material fact preclude summary judgment for Defendants on each of these claims. (Opp'n 11–25, ECF No. 62.)

### A. Excessive Force, 42 U.S.C. § 1983

Plaintiffs assert an excessive force claim based on Crespin's and Knox's use of deadly force when shooting Carlson and Valdivia's use of non-deadly force when apprehending Carlson's parents.  (*See* Compl.)  Defendants contend they are entitled to summary judgment on Plaintiffs' excessive force claim because the uncontroverted evidence shows Crespin's and Knox's use of deadly force—and Valdivia's and other

officers' use of force to move Carlson's parents away from the scene—do not constitute constitutional violations under the circumstances.  (Mot. 18–23.)  Thus, Defendants argue that the force used is objectively reasonable, thereby entitling Defendants to qualified immunity.  (*Id.*)  Defendants alternatively argue that even if a jury could find the officers' use of force is a not objectively reasonable and therefore, is a constitutional violation, they are nevertheless entitled to qualified immunity because there was no clearly established fact-specific precedent at the time of the incident, putting them on notice that their conduct was a constitutional violation.  (*Id.* at 24–26.)

"The Supreme Court has explained that '[t]he doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  In determining whether qualified immunity applies, the Ninth Circuit first determines "whether the officers actually violated a constitutional right based on the record and plaintiffs' alleged facts."  *Monzon v. City of Murrieta*, 978 F.3d 1150, 1156 (9th Cir. 2020).  If the court finds that "no constitutional right was violated, then no further analysis is required."  *Id.*  However, if the court finds "that the officers *did* violate a constitutional right [it would] then need to proceed to the second step of the inquiry to decide if the constitutional right 'was clearly established at the time of [the officers'] alleged misconduct.'"  *Id.* (second alteration in original) (quoting *Pearson*, 555 U.S. at 232).

### 1.   Constitutional Violation

"Because apprehending a suspect through the use of deadly force is considered a Fourth Amendment seizure of the person, [courts] must determine if the officers acted in an objectively reasonable manner when they [used] deadly force or if they violated [the suspect's] right to be free from unreasonable seizures."  *Id.* at 1157.

1        Applying the holdings of *Graham v. Connor*, 490 U.S. 386 (1989), the Ninth

2   Circuit analyzes reasonableness by "considering the nature and quality of the alleged

3   intrusion" and "the governmental interests at stake by looking at (1) how severe the

4   crime at issue is, (2) whether the suspect posed an immediate threat to the safety of

5   the officers or others, and (3) whether the suspect was actively resisting arrest or

6   attempting to evade arrest by flight" (the "*Graham* factors").  *Mattos*, 661 F.3d at 441

7   (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001)); *see*

8   *Graham*, 490 U.S. at 396.   "[T]here are no per se rules in the Fourth Amendment

9   excessive force context; rather, courts must still slosh their way through the

10  factbound morass of 'reasonableness.'"  *Id.* (alteration and internal quotation marks

11  omitted) (quoting *Scott*, 550 U.S. at 383).

12       The reasonableness of the force used is "judged from the perspective of a

13  reasonable officer on the scene."  *Graham*, 490 U.S. at 396.   An officer cannot

14  simply claim that he "fear[ed] for his safety or the safety of others . . . there must be

15  objective factors to justify such a concern."  *Young v. County of Los Angeles*,

16  655 F.3d 1156, 1163 (9th Cir. 2011).  Notably, the fact that the suspect was armed—

17  or even reasonably believed to be armed—with a deadly weapon does not render the

18  officers' response per se reasonable under the Fourth Amendment.  *George v. Morris*,

19  736 F.3d 829, 838 (9th Cir. 2013).

20       In light of the above, "[w]here the objective reasonableness of an officer's

21  conduct turns on disputed issues of material fact, it is 'a question of fact best resolved

22  by a jury'; only in the absence of material disputes is it 'a pure question of law.'"

23  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (first quoting *Wilkins*

24  *v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003); and then quoting *Scott*,

25  550 U.S. at 381 n.8).  As such, "summary judgment or judgment as a matter of law in

26  excessive force cases should be granted sparingly."  *Id.* at 1125.

27

28

### a. *When Using Deadly Force Against Carlson*

At least two genuine disputes material fact preclude summary judgment on the excessive force claim as to Crespin's and Knox's deadly force against Carlson. Specifically, the parties dispute facts material to the first two *Graham* factors: (1) whether the crime at issue was severe, and (2) whether Carlson posed an immediate threat of harm to the officers or others, which is the most significant factor. *See Mattos*, 661 F.3d at 441; *see also Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc), *cert. denied*, 545 U.S. 1128 (2005) (finding whether plaintiff posed a threat to be the most important of the *Graham* factors). Additionally, Defendants cite no evidence to support their position as to the third *Graham* factor: whether Carlson was actively resisting, or attempting to evade, arrest.

### i. *Whether the Crime was Severe*

In this case, the parties factually dispute what crime was at issue when the Crespin and Knox used deadly force against Carlson. The parties agree that the police were called in response to a "family disturbance," for which callers reported hearing screaming, threats, and the cocking of a gun. (DSUF 1–3.) However, Plaintiffs contend that they never committed any crime because "Plaintiffs were the only people in 1002 Esplanade at the time . . . [and] were not screaming, making loud noises, arguing loudly, and were not in a heated argument on the night of the incident." (PSGD 11, 14, 15.) Significantly, Plaintiffs assert that Carlson "never had a gun in his hand" during the incident. (*Id.* at 16, 18 19.) Thus, Plaintiffs conclude, "No crime was being committed; [Carlson] was unarmed, his hands were visibly empty, [and he] did not make any violent, threatening or furtive movements or gestures." (*Id.* at 34.) Plaintiffs support their contentions with deposition testimony, photographs, and police officer body camera footage. Plaintiffs argue that "the initial call for service was to an unknown location which was never determined to be the Plaintiffs' home." (Opp'n 13.) Plaintiffs further support their argument with Defendants' concession that the officers did not know from which residence the

screaming came.  (Opp'n 13; DSUF 6; Defs.' Resp. PSGD 65, 70.)  Thus, at the very least, there is a material factual dispute as to whether any crime was being committed at the Residence, and therefore by the Plaintiffs, at all.

Here, both the existence and the seriousness of the domestic dispute are at issue.  Even assuming Defendants are correct that a "serious family disturbance" was occurring at the Residence, (Mot. 21), such an offense would not necessarily constitute a "severe crime[] in a *Graham* analysis," *Mattos*, 661 F.3d at 444.  Although the Court acknowledges the danger that may result from domestic disputes, the Ninth Circuit has held that even domestic disputes involving physical violence do not "warrant the conclusion that [the suspect is] a particularly dangerous criminal or that his offense was especially egregious." *Smith*, 394 F.3d at 702; *see Thomas v. Dillard*, 818 F.3d 864, 890 (9th Cir. 2016), as amended (May 5, 2016) (finding that domestic violence involving a physical assault "was not particularly severe" under *Graham*).  Even if Carlson and his parents were engaged in a dispute, the 911-callers only reported hearing verbal disputes and the cocking of a gun.  (*See* DSUF 1–4.)  Defendants provide no evidence or allegations that any callers reported seeing or hearing any actual physical violence.  (*Id.*)  Assuming such a domestic dispute occurred, its seriousness remains unclear.  Thus, the Court finds that there is a genuine dispute of material fact as to the existence and severity of the crime.

### ii.   *Whether Carlson Posed an Immediate Threat*

Defendants argue that Carlson posed an immediate threat to the officers and others because the 911-callers reported hearing death threats and the cocking of a gun and the officers heard yelling coming from the Residence as they approached it.  (DSUF 2–4, 10, 14, 15.)  Upon arrival at the Residence, Crespin observed Carlson holding a gun to his head and, after commanding that Carlson drop the gun, Crespin saw Carlson "start turning towards him."  (*Id.* at 16, 21.)  Therefore, the issue is whether these circumstances constituted an immediate threat to which Crespin responded with his initial gunshots.

Defendants assert that Knox heard Crespin's "drop the gun" warnings and gunshots and then saw flashes inside the Residence but "did not know whether the gunshots came from inside or outside of the house." (*Id.* at 25, 26.) Knox "saw [Carlson] start to walk out the back door and turn towards [him]" but could not see Carlson's hands. (*Id.* at 27, 28.) Citing to Knox's deposition testimony, Defendants argue that Carlson was wearing a "bulky jacket" and Knox could not see his hands; Knox stated that Carlson appeared to have a weapon. (*Id.* at 28, 29; Knox Dep. 8:20–24, 9:1–12, 9:19–20, 10:11–14, 11:14–18.) Knox contends he commanded Carlson to show his hands but Carlson did not comply with the commands and, instead, started to turn to walk toward Knox. (DSUF 30–32; Knox Dep. 11:14–18; 14:14–25.) Thus, the issue is whether these circumstances establish an immediate threat to which Knox responded with his gunshot.

Plaintiffs dispute these contentions. Regarding the immediate harm to justify Crespin's gunshots, Plaintiffs argue that the officers never heard any yelling coming from the Residence because they were not yelling, Carlson never held a gun, "Carlson's hands were visibly empty," and Carlson never turned toward Crespin. (PSGD 11, 14, 15, 16, 18–23.) Regarding the immediate harm to justify Knox's gunshots, Plaintiffs also dispute that Knox ever saw flashes from inside the Residence, that Carlson was wearing any bulky clothing, that Carlson's hands were not visible, that Carlson had a weapon, and that Carlson ever turned and started to walk towards Knox. (*Id.* at 28–31.) Plaintiffs support their arguments with the deposition testimonies of Carlson and both his parents, as well as photographs and police body camera video footage. Accordingly, Plaintiffs conclude, that Carlson was unarmed and his hands were visibly empty and Carlson therefore posed no immediate threat to Crespin, Knox, or others. Thus, there are genuine disputes of fact as to whether Carlson posed an immediate threat.

Although Plaintiffs provide police body camera footage in an attempt to resolve these disputes, (*see* Notice Manual Filing ("BC Footage"), ECF No. 68), the

BC Footage is not sufficiently clear that it blatantly contradicts either version of the events. *See A.G., 1-4 v. City of Fresno*, 804 F. App'x 701, 702 (9th Cir. 2020) (citing *Scott*, 550 U.S. at 381) (finding the court may "view[] the facts in the light depicted by the video[]" to the extent that it "blatantly contradict[s]" one party's version of the incident). Viewing these factual disputes in the light most favorable to Plaintiffs— that Carlson had no weapon, his hands were visibly empty, he complied with Crespin's and Knox's commands, and did not move towards them—a reasonable jury could conclude that either or both Crespin's and Knox's use of force was not objectively reasonable. Thus, this factor cannot be resolved on summary judgment.

### iii.   *Whether Carlson Was Attempting to Resist or Evade Arrest*

Defendants do not offer any evidence to show that Carlson was attempting to resist or evade arrest. Furthermore, the parties agree that after the officers shot Carlson, he "did not resist at all." (PSGD 154.) This factor therefore weighs slightly against finding that the officers acted with objective reasonableness.

### iv.   *Whether Crespin and Knox Had Other Means to Capture Carlson*

Finally, although not an explicit *Graham* factor, "[c]ourts may also consider 'the availability of alternative methods of capturing or subduing a suspect.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (quoting *Smith*, 394 F.3d at 701). Based on the above discussion and conclusions, there is also a genuine dispute as to whether Crespin's and Knox's only choice in capturing Carlson was by shooting him, or if they could have taken additional time to give Carlson additional verbal warnings and commands to capture or subdue him. Additionally, Defendants themselves assert that prior to the shooting, the officers "discussed a tactical plan, which included one of the officers, Officer Siegfried, to carry a less-lethal weapon, a .40 millimeter." (DSUF 9.) The parties agree that Siegfried was in fact equipped with that less-lethal weapon and another officer was assigned the ballistic shield to protect the officers. (PSGD 33–34.) The officers were "also equipped with other less-lethal tools such as a Taser, OC spray, and baton." (*Id.* at 76.) Accordingly,

whether the officers could have used these alternative methods of capturing or subduing Carlson—or whether they did not have the time or physical ability to risk using less deadly means—is a question of material fact that is in genuine dispute and not resolvable on summary judgment.

Thus, in view of the above *Graham* factor analysis, Defendants are not entitled to summary judgment on the basis that the deadly force used against Carlson was not a constitutional violation.

### b. <u>When Apprehending Carlson's Parents</u>

Defendants also argue Plaintiffs do not have evidence to support their claim that Valdivia or other officers used excessive force when apprehending Carlson's parents and moving them away from the scene of the shooting.   (Mot. 23.) Defendants contend that even if Plaintiffs do have such evidence, the "scene was not secure" and there was a gun inside the house—warranting the force Valdivia and other officers used against Carlson's parents.   (*Id.*)   The Court first looks to the severity of the force used and then again looks to the other *Graham* factors to determine if Defendants are entitled to summary judgment on Plaintiffs' excessive force claim as applied to Carlson's parents.

Here, Valdivia and the other officers apprehended Carlson's parents with so much force that they injured Carlson's mother and tore both of Carlson's father's rotator cuffs so that he requires surgery.  (PSGD 130, 133, 134.)  The officers also "shoved [Carlson's father] . . . into a thorned bougainvillea . . . which cut his neck." (*Id.* at 135.)  The force used against Carlson's parents was not deadly and instead, was relatively moderate.  *See, e.g.*, *Petros v. Duncan*, No. 1:19-cv-00277-SAB, 2019 WL 3459094, at *3 (E.D. Cal. July 31, 2019), (finding that an officer "used at least moderate force" when he "swept [the suspect's] legs and 'slammed' him to the ground"); *Wilson v. Kelly, ID No. 6540*, No. 11-cv-2296-LAB (RBB), 2013 WL 3864339, at *3 (S.D. Cal. July 24, 2013) (describing the officers' conduct of holding the suspect's arms behind his back, punching, and beating him, as "moderate force").

Although this lesser force lowers the degree of justification the officers needed, on balance against the *Graham* factors, Defendants still fail in their burden to show that this moderate force was objectively reasonable when Carlson's parents had not and were not committing any crime or resisting the officers. *See id.* (finding that the officers were not entitled to qualified immunity on summary judgment because—when construing the facts in the light most favorable to the non-movant—the officers' moderate force was excessive when the suspect was only reported for assault and did not resist arrest).

First, Defendants offer no evidence to demonstrate that any crime was being committed when the officers apprehended Carlson's parents. The parties agree that the officers handcuffed Carlson—the suspect in this case—immediately after shooting him. (DSUF 35.) Thus, the possible crime of a domestic dispute between Carlson and his parents was no longer at issue. Additionally, Defendants do not contend that, at the time Valdivia originally apprehended them, Carlson's parents were doing anything besides yelling at the officers who had just shot their son; this is not a crime. Finally, the parties agree that "Valdivia never saw [Carlson's parents] commit any crime and had no information that they had committed a crime before." (PSGD 139.) And Plaintiffs cite to deposition testimony to support their claim that no crime was ever being committed. (*Id.* at 88.) Thus, the severity of the crime committed when Valdivia and the other officers apprehended Carlson's parents strongly weighs against the objective reasonableness of the officers' conduct.

Second, Defendants offer no evidence of a threat of immediate harm posed to the officers or others when they apprehended Carlson's parents. Although Defendants contend that the scene was not secure and there was a gun in the house, (Mot. 23), any threat of immediate harm was diminished by the fact that Carlson was already handcuffed and Carlson's parents were not inside the house or near the gun, (PSGD 149). Defendants make no showing that Carlson's parents attempted to reenter the house, posed any threat to the officers or otherwise compromised

anyone's safety, interfered with the officers' arrest of Carlson, or otherwise jeopardized the officers' investigation. In fact, the parties agree that Carlson's father "complied with officer commands to take his hands out of his pockets, and even put his hands straight up in the air at one point" and Carlson's mother was "unarmed and not moving at all" at the time. (*Id.* at 141, 144.) Notably, "Valdivia admitted that it would not be appropriate to use force against [Carlson's parents]." (*Id.* at 138.) Thus, this factor weighs against objective reasonableness of the officers' conduct.

Third, Defendants make no showing that Carlson's parents were attempting to evade arrest. To the contrary, citing to undisputed facts, Plaintiffs contend that Carlson's parents were compliant with the officers. (Opp'n 16.) The factor of whether Carlson's parents were attempting to evade the officers therefore weighs against the objective reasonableness of the officers' conduct.

Finally, with regard to alternative means of apprehension, Defendants do not suggest the officers had no other means of subduing Carlson's parents and, conversely, Plaintiffs argue that Carlson's parents were compliant with the officers, thereby suggesting they would have responded to verbal commands to walk away from the scene, or that the officers could have used less force when moving them away. Thus, this factor also weighs against finding Valdivia's and the other officers' conduct was objectively reasonable. Accordingly, Defendants do not meet their burden of showing that the force used against Carlson's parents was objectively reasonable, and therefore not a constitutional violation.

### 2. *Clearly Established, Fact-Specific Precedent*

Defendants alternatively argue that, even if they are not entitled to summary judgment based on the lack of a constitutional violation, Defendants are nevertheless entitled to summary judgment on the excessive force claim because Plaintiffs have no evidence to support the second step of the qualified immunity analysis: whether clearly established fact-specific precedent existed that rendered the officers' use of

deadly force against Carlson unconstitutional.[3]   Thus, the Court must determine whether the officers' conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."   *Bryan v. MacPherson*, 630 F.3d 805, 832 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

As discussed above, the Court finds that there are genuine disputes of material fact as to the circumstances surrounding Crespin's and Knox's use of deadly force against Carlson.   Thus, the Court views all disputed facts in the light most favorable to Plaintiffs, the non-movants.   Under this recitation of the facts, the officers fired lethal gunshots at Carlson when he had not and was not committing any crime, had no weapon, made his empty hands visible to the officers, did not threaten or move toward the officers, and complied with the officers' commands—thereby posing no immediate threat to the officers or others.   At the time of these events, every police officer would have known that it is objectively unreasonable to shoot an unarmed suspect who poses no immediate threat.   *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").   Thus, viewing the disputed facts in the light most favorable to Plaintiffs, it was clearly established at the time of the incident that Crespin's and Knox's deadly force against Carlson was unconstitutional.   *See id.* (concluding deadly force is permissible only when "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm . . . .").

In summary, there is a genuine dispute of material fact regarding whether Carlson posed an immediate threat to the officers or others, which precludes the Court from finding the officers' force against Carlson was not a constitutional violation.   *See Smith*, 394 F.3d at 701 ("Because [the excessive force inquiry] nearly

---

[3] Although Defendants argue that there is no fact-specific precedent regarding Crespin's and Knox's deadly force against Carlson, Defendants do not assert this same argument as applied to Carlson's parents.   (*See* Mot. 24–26.)   Thus, the Court does not consider such an argument.

always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." (alteration in original)); *see also Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1198 (9th Cir. 2001), *cert. granted, judgment vacated*, 534 U.S. 801 (2001) ("Although excessive force cases can be decided as a matter of law, they rarely are because the Fourth Amendment test for reasonableness is inherently fact-specific.")  Additionally, Defendants did not meet their burden to show that the use of force against Carlson's parents was not a constitutional violation.  Finally, Defendants failed to show Crespin and Knox are entitled to qualified immunity based on a lack of fact-specific precedent rendering their deadly force unconstitutional. Thus, the Court **DENIES** Defendants' Motion as to Plaintiffs' excessive force claim.

**B.     Municipal Liability Claims**

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert municipal liability claims for (i) an unconstitutional custom, policy or practice, (ii) ratification, and (iii) failure to train.  Defendants seek summary judgment on all three claims, arguing that Plaintiffs lack supporting evidence.  As explained below, the Court finds that a reasonable jury could conclude that Plaintiffs offer sufficient evidence to establish their claims.

     *1.     Municipal Liability Against Individual Officers*

Defendants first argue that they are entitled to summary judgment on Plaintiffs' municipal liability claims against Crespin, Knox, and Valdivia because there is no evidence of any constitutional violation, as required under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  (Mot. 26.)  As discussed, the Court finds there is a genuine dispute of material fact as to whether the officers' force was a constitutional violation.  Thus, the Court denies Defendants' Motion as to this claim.

     *2.     Unconstitutional Custom or Policy*

Defendants next seek summary judgment as to Plaintiffs' second claim against the City, arguing that Plaintiffs have no evidence of an unconstitutional custom or

policy.  (Mot. 26–27.)  In *Monell*, the Supreme Court held that municipalities may be held liable under § 1983 only for constitutional violations resulting from official county custom or policy.  436 U.S. at 694.  "The custom or policy must be a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Benavidez v. County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (alteration in original; internal quotation marks omitted).  The policies can include "written policies, unwritten customs and practices, [and] failure to train municipal employees on avoiding certain obvious constitutional violations."  *Id*.

Here, the parties agree that the City "had policies in effect at the time of plaintiffs' incident regarding the use of force and investigating domestic violence calls."  (DSUF 53.)  Defendants contend that these policies "complied with applicable law" and therefore were not unconstitutional.  (Mot. 27.)  In support of their contention, Defendants provide copies of these policies.  (Smith Decl. ¶¶ 25, 26, Exs. 23, 24, ECF Nos. 45-7, 45-8.)  In opposition, Plaintiffs argue that "[o]n Plaintiffs' facts, City has a widespread, pervasive practice of insulating deputies from accountability of shootings."  (Opp'n 22–23.)  Specifically, Plaintiffs contend that in the ten years prior to the incident, the City (i) determined that "zero" RBPD officer's use of deadly force has been out of policy, (ii) sustained "zero" unreasonable force complaints, (iii) terminated "zero" RBPD officers due to a use of force issue, and (iv) have disciplined "zero" officers as a result of their use of deadly force.  (PSGD 175.)  Plaintiffs cite to several interrogatory responses in support of these contentions.  Defendants do not dispute these facts.  (Defs.' Resp. PSGD 175.)

Plaintiffs contend the City applied their practice of insulating officers from accountability in this case by failing to take investigative or remedial action toward the responding officers following the incident.  Citing to numerous deposition testimonies and responses to requests for admission, including testimony and

responses provided by Defendants, Plaintiffs assert that (i) the officers were not disciplined by any person or agency for their actions during the incident; (ii) there was no debriefing in the RBPD following this incident and the City did not conduct an internal investigation into this incident; (iii) Defendants were not required to repeat any training or undergo any additional training concerning the use of force based on their actions during the incident; and (iv) Defendants did not provide any training or retraining, or revise any policies or training, as a result of the incident. (*Id.* at 176–179.) Defendants again do not dispute these facts. (Defs.' Resp. PSGD 176–179.) Based on Plaintiffs' assertions and supporting evidence, a reasonable jury could find that the City has at least an unwritten policy of not investigating, redressing, or otherwise responding to excessive force incidents, which could constitute an unconstitutional policy. Thus, the Court denies Defendants' Motion as to this claim.

### 3. Ratification or Authorization

Defendants next contend that Plaintiffs have no evidence of the City ratifying or authorizing an unconstitutional policy or custom, as required by *Monell*, and Defendants and therefore entitled to summary judgment on Plaintiffs' third claim. (Mot. 27–28.) Municipalities alternatively "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (internal quotation marks omitted). Here, the same evidence Plaintiffs cite to support their claim of an unconstitutional custom or policy also supports their claim that the City ratified or authorized such custom or policy. Thus, the Court finds that a reasonable jury could conclude that Plaintiffs met their burden as to this claim and the Court therefore denies summary judgment for Defendants.

### 4. Failure to Train

Finally, Defendants argue that Plaintiffs have no evidence of a failure to train the officers and therefore cannot meet the elements of their fourth claim. (Mot. 28.)

Here, Defendants cite to undisputed facts supported by evidence that RBPD officers received training with respect to the use of force and responding to domestic dispute calls.  (DSUF 48.)  Defendants state that Crespin was never trained that he could shoot someone for merely seeing a gun in their hand but was trained that a warning should be given when feasible.  (*Id.* at 49–50.)  Crespin was also trained to "to reassess the situation and use the appropriate tools and force given" if a suspect complied with his commands to drop the weapon.  (*Id.* at 51.)  Defendants contend that Knox "was never trained that he could shoot someone if he could see their hands and they did not have a weapon in their hands."  (*Id.* at 52.)  In support of these contentions, Defendants cite to the deposition testimonies of all three officers.

In opposition, Plaintiffs cite to the opinion of their police practices expert, Roger Clark, finding "that the City of Redondo Beach has inadequate training and policies regarding the use of force and tactics."  (PSGD 167.)  Plaintiffs also cite to deposition testimony and responses to requests for admission to support their claim that the City failed to train RBPD officers to use deadly force only "as a last resort" and "in limited circumstances."  (*Id.* at 168.)  Based on this evidence, a reasonable jury could find that the City has indeed failed to adequately train its officers. Accordingly, the Court cannot grant summary judgment for Defendants on this claim.

Thus, Plaintiffs have offered evidence sufficient for a reasonable jury to find for Plaintiffs on each of their municipal liability claims.   The Court therefore **DENIES** Defendants' Motion for summary judgment on these claims.

## C.    State Law Claims

Defendants also move for summary judgment on Plaintiffs' state law claims for battery and negligence, negligent infliction of emotional distress ("NIED"), and violation of the Bane Act.  (Mot. 28–29.)  As explained below, genuine disputes of material fact preclude the Court from granting summary judgment on these claims.

*1.   Battery*

Defendants seek summary judgment on Plaintiffs' battery claim, summarily arguing that it fails "for the same reason their federal claim fails."   (Mot. 28.) However, a battery claim arising out of excessive force by a peace officer is evaluated by way of traditional Fourth Amendment analysis under *Graham*.   *See Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 (2004), *modified on denial of reh'g* (Aug. 17, 2004), *disapproved of on other grounds by Hayes v. County of San Diego*, 57 Cal. 4th 622 (2013).   As discussed, there are genuine disputes of material fact as to whether the officers used unreasonable force against Carlson and his parents.   Thus, summary judgment on the battery claim is also inappropriate.

*2.   Negligence*

Defendants seek summary judgment on Plaintiffs' negligence claim, also summarily arguing that it fails for the same reasons the federal claims fail.  (Mot. 28.) As the Court finds that genuine disputes of material fact preclude summary judgment on those claims, Defendants are also not entitled to summary judgment on Plaintiffs' negligence claim.

*3.   NIED*

Defendants move for summary judgment on Plaintiffs' NIED claim, arguing that it is not an independent tort.  (Mot. 28–29.)   Defendants are correct that the California Supreme Court "has made abundantly clear, there is no such thing as the independent tort of negligent infliction of emotional distress" and that an NIED claim is merely a theory of recovery falling within the ambit of negligence claim.  *Hardin v. Wal-Mart Stores, Inc.*, 813 F. Supp. 2d 1167, 1178 (E.D. Cal. 2011) (quoting *Lawson v. Mgmt. Activities*, 69 Cal. App. 4th 652, 656 (1999)).   However, Defendants seek summary judgment on Plaintiffs' NIED claim only insofar as Plaintiffs assert it as an independent cause of action—and do not substantively dispute Plaintiffs' ability to recover for NIED as a part of their negligence claim. Because the Court does not find that Defendants are entitled to summary judgment on

Plaintiffs' negligence claim, the court also does not find that they are so entitled as to Plaintiffs' NIED claim.

### 4.     Bane Act

Defendants also seek summary judgment on Plaintiffs' Bane Act claim, arguing that "the uncontroverted facts demonstrate that defendants' use of force was objectively reasonable under the totality of the circumstances." (Mot. 29.)  The Court has determined this is not the case, and based on genuine disputes of material fact, a reasonable jury to find Defendant Officers' use of force unreasonable.

California Civil Code section 52.1 provides a claim "against anyone who interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's exercise or enjoyment of rights secured by federal or state law." *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 331 (1998).  A Bane Act claim is premised on the violation of a federal constitutional right, and as such, a court must look to the elements of the constitutional claim to determine whether a Bane Act claim has merit.  *See Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1168 (N.D. Cal. 2009) ("The elements of a section 52.1 excessive force claim are essentially identical to those of a § 1983 excessive force claim.").  As discussed above, there are genuine disputes of material fact as to whether Defendants violated Plaintiffs' constitutional rights.  Accordingly, summary judgment is not appropriate on the Bane Act claim.

Thus, Plaintiffs have offered evidence sufficient for a reasonable jury to find for Plaintiffs on each of their state law claims.   The Court therefore **DENIES** Defendants' Motion for summary judgment on these claims.

### D.    Punitive Damages

Finally, Defendants seek summary judgment as to Plaintiffs' claim for punitive damages, arguing that "there is no evidence that the defendants acted with malice, oppression, or reckless disregard toward plaintiff's rights." (Mot. 30.)  The Court disagrees.   Under California law, punitive damages are appropriate only "if the defendant acted with intent or engaged in 'despicable conduct.'"  *In re First All.*

*Mortg. Co.*, 471 F.3d 977, 998 (9th Cir. 2006) (quoting Cal. Civ. Code § 3294(c)). Punitive damages may be warranted even if the "despicable conduct" merely involves a conscious disregard of the rights and safety of others, without an affirmative intent to injure. *Id.* Based on the above discussion, a reasonable jury could find that Defendants acted with a "conscious disregard" for Plaintiffs' rights and safety. Thus, the Court **DENIES** Defendants' Motion for summary judgment as to punitive damages.

## VI.   CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants' Motion for Summary Judgment. (ECF No. 45.)

**IT IS SO ORDERED.**

May 12, 2022

_____
        **OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

23